J-S63016-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.J., MOTHER | |
| | No. 1928 EDA 2015 |

Appeal from the Order Entered May 12, 2015
In the Court of Common Pleas of Monroe County
Orphans' Court at No(s): 18 OCA 2015

| | |
|---|---|
| IN THE INTEREST OF: M.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.J., MOTHER | |
| | No. 1933 EDA 2015 |

Appeal from the Order Entered May 12, 2015
In the Court of Common Pleas of Monroe County
Orphans' Court at No(s): 19 OCA 2015

| | |
|---|---|
| IN THE INTEREST OF: C.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.J., MOTHER | |
| | No. 1934 EDA 2015 |

Appeal from the Order Entered May 12, 2015
In the Court of Common Pleas of Monroe County
Orphans' Court at No(s): 20 OCA 2015

J-S63016-15

IN THE INTEREST OF: S.S., A MINOR | IN THE SUPERIOR COURT OF
| PENNSYLVANIA

APPEAL OF: A.J., MOTHER |

| No. 1935 EDA 2015

Appeal from the Order Entered May 12, 2015
In the Court of Common Pleas of Monroe County
Orphans' Court at No(s): 21 OCA 2015

BEFORE:  DONOHUE, J., MUNDY, J., and MUSMANNO, J.

MEMORANDUM BY MUNDY, J.:                    **FILED NOVEMBER 23, 2015**

Appellant, A.J. (Mother), appeals from the May 12, 2015 orders involuntarily terminating her parental rights to four children, C.S., M.S., S.S.1, and S.S.2 (collectively, the Children).[1]  After careful review, we affirm.

In its opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), the orphans' court fully and correctly set forth the factual and

_____

[1]  C.S., a female, was born in January 2006, M.S., a male, was born in November 2007, S.S.1, a female, was born in February 2009, and S.S.2, a female, was born in September 2013.  As two of the children have the initials S.S., we have elected to refer to the older daughter as S.S.1, and the younger daughter as S.S.2.  Mother's rights to five other biological children have also been terminated; however, those children are not the subjects of this appeal.

- 2 -

procedural history of this case, which we adopt herein. *See* Orphans' Court Opinion, 7/22/15, at 1-9.

On May 12, 2015, the orphans' court involuntarily terminated the parental rights of Mother and B.S. (Father)[2] pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[3] On June 11, 2015, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i), which this Court consolidated *sua sponte*. ***See generally*** Pa.R.A.P. 513.

On appeal, Mother raises the following issue for our review.

> 1. Whether the [orphans'] [c]ourt erred by terminating the parental rights of Mother, where there was no clear and convincing evidence that established statutory grounds for termination of parental rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and where termination does not serve the developmental, physical and emotional needs of the [C]hildren?

Mother's Brief at 4.

Our review is guided by the following well-settled law.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts

---

[2] Father did not file notices of appeal, and he is not a party to this appeal.

[3] We note that the Guardian Ad Litem, at the conclusion of the termination hearing, recommended the involuntary termination of Mother's parental rights to the Children. N.T., 5/4/15, at 86-87.

review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

- 4 -

Instantly, we conclude that the trial court properly terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b), which provide as follows.[4]

**§ 2511. Grounds for involuntary termination**

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights

_____

[4] This Court need only agree with any one subsection of 23 Pa.C.S.A. § 2511(a), along with Section 2511(b), in order to affirm the termination of parental rights*. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, in light of our disposition as to Section 2511(a)(2), we need not consider Mother's arguments with respect to Section 2511(a)(1). We further conclude that termination pursuant to Section 2511(a)(5) and (8) was not proper because Mother was incarcerated at the time of the Children's placement. **See In re C.S.**, 761 A.2d 1197, 1200 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care); **accord In re Z.P.**, 994 A.2d 1108, 1123 n.2 (Pa. Super. 2010).

of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b). "The grounds for termination [of parental rights under Section 2511(a)(2),] due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The *S.P.* Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *Id.* at 828.

With respect to Section 2511(b), the requisite analysis is as follows.

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and

- 6 -

welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Mother argues that the record evidence does not support the termination of her parental rights pursuant to Section 2511(a)(2). Specifically, Mother asserts the orphans' court abused its discretion in finding that she "had not made sufficient efforts to secure appropriate housing and employment…" Mother's Brief at 9.

Upon careful review, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(2). As such, we adopt the orphans' court's Rule 1925(a) opinion as dispositive of Mother's issue. *See* Orphans' Court Opinion, 7/22/15, at 24 (finding, in part, that "Mother has consistently been unable to obtain and maintain either suitable housing or employment. She has also continued to use drugs, was irregular with drug testing and appears to have manipulated the most recent [drug] screens she provided…")

With respect to Section 2511(b), Mother asserts the orphans' court abused its discretion because the record shows she "has continued love, protection and concern for [the C]hildren, and that the bond between Mother and [the C]hildren is very strong, and in her words 'unbreakable.'" Mother's Brief at 9-10.

Our Supreme Court has explained that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." **T.S.M.**, **supra**. Indeed, in considering the affection a child may have for his or her natural parents, this Court has held as follows.

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent…. Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in [and] of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

**In re K.K.R.-S.**, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

This Court has also stated as follows.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015), *quoting*

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Instantly, upon careful review, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(b). As such, we adopt the orphans' court's Rule 1925(a) opinion as dispositive of Mother's issue with respect to Section 2511(b). *See* Orphans' Court Opinion, 7/22/15, at 27 (finding, in part, that "there was some evidence of a bond between Mother and the Children", but that terminating Mother's parental rights would serve the developmental, physical, and emotional needs and welfare of the Children).

Based on the foregoing, we conclude the orphans' court did not abuse its discretion in terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b). *See T.S.M.*, *supra*. Accordingly, we affirm the orphans' court's May 12, 2015 orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/23/2015</u>

Circulated 11/12/2015 12:57 PM

RECEIVED JUL 2 3 2015

## COURT OF COMMON PLEAS OF MONROE COUNTY
## FORTY-THIRD JUDICIAL DISTRICT
## COMMONWEALTH OF PENNSYLVANIA
## JUVENILE COURT DIVISION

| | |
|---|---|
| IN THE INTEREST OF C.S., a minor | :      20 OCA 2015<br>: APPEAL NO. 1934 EDA 2015<br>: |
| IN THE INTEREST OF M.S., a minor | :      19 OCA 2015<br>: APPEAL NO. 1933 EDA 2015<br>: |
| IN THE INTEREST OF S.S., a minor | :      18 OCA 2015<br>: APPEAL NO. 1928 EDA 2015<br>: |
| IN THE INTEREST OF S.S., a minor | :      21 OCA 2015<br>: APPEAL NO. 1935 EDA 2015<br>: |

## OPINION PURSUANT TO Pa. R.A.P. 1925(a)

A.J. ("Mother") has appealed our decrees terminating her parental rights to her children, C.S., M.S., S.S.1, and S.S. 2. (collectively "the Children").[1] The parental rights of the children's father, B.S. ("Father") were also terminated. However, Father did not file an appeal.

As required by the Children's Fast Track Rules, Mother filed statements of errors complained of on appeal pursuant to Pa. R.A.P. 1925(b) with her notices of appeal. The statements are identical. In each case, Mother raises the same boilerplate, general assertion that, "[t]he trial Court erred by terminating the parental rights of the biological mother because statutory grounds for termination of parental

---

[1] Two of the Children have the initials "S.S." As a result, we will use "S.S.1," whose case is docketed to No. 18 OCA 2015, to designate the older of the two children, and "S.S.2," whose case is docketed to No. 21 OCA 2015, to designate the younger.

rights under 23 Pa. C.S.A. §2511 (a)(1), (2), (5), (8), and (b) were not established by clear and convincing evidence, and because termination of parental rights does not serve the developmental, physical, and emotional needs and welfare of the child." Mother's assertions are meritless.[2]

This family first came to the attention of Monroe County Children and Youth Services ("CYS") in 2010, before S.S.2 was born. Specifically, during the 2010 – 2011 school year, CYS received two referrals that Mother's older child, A.P., the Children's half-sibling, was truant from school. (N.T., 5/4/2015, pp. 4-7).

In December of 2010, CYS received a referral that Mother was using drugs, that she was not properly supervising the children, and that there was no heat in the home. At that time, Father was in jail for non-payment of child support for children who lived with their mother in a different state. (Id.).

The allegations were substantiated and it was discovered that A.P. had not been in school for a month. CYS facilitated a private arrangement whereby the children, including A.P., went to live with Paternal Grandmother. After Father was released from jail, he resided with the children in Paternal Grandmother's home. (Id.). Mother lived separately.

Thereafter, CYS provided services to the family. In April of 2011, A.P. was removed from Paternal Grandmother's home and placed in foster care due to a physical altercation between Father and A.P. (Id. at 7).

CYS continued to monitor and provide services to the family. In December of 2011, Mother gave birth to another sibling, L.L., who is not involved in these cases.

---

[2] Although the children's cases are docketed separately, we are filing a single, consolidated opinion because the relevant facts and history are the same, the challenged decrees were issued following a single, consolidated termination hearing, and the issues raised by Mother in all cases are identical.

2

LL.'s father is S.L., not Father. L.L. was taken into custody, and ultimately adjudicated dependent, as a result of Mother's continued drug use, unstable housing, and non-compliance with family service plans for the Children. (*Id.*).

In 2012, CYS administratively split the family's cases. The cases involving A.P. and L.L., both of whom had been adjudicated dependent, were assigned to and serviced by the Adoption Unit. A separate case remained open in the Protective Unit for the Children, who had not at the time been adjudicated dependent. (*Id.* at 8).

In November of 2012, the case involving the Children was closed. At that time, the Children were living with Father and were doing well. Paternal Grandmother remained involved. Mother was not involved. (*Id.*).

Thereafter, the cases involving A.P. and L.L. moved to termination of parental rights. L.L. was subsequently adopted. A.P. remains in foster care. (*Id.* at 8-9).

In April of 2013, CYS received a referral about Father's drug use, lack of supervision, and poor conditions in the home. The allegations were unsubstantiated. (*Id.* at 9-10).

Father struggled somewhat, but was able to care for the other Children for a while. As time progressed, it became apparent that M.S. had some behavior issues. Father asked for help, but never followed through on the suggestions and assistance offered by CYS. (*Id.* at 17).

In September of 2013, CYS received a referral that Mother, who had been incarcerated for non-payment of support for the Children, was at a local hospital about to give birth to S.S.2. At that time, Father and the other Children were living with Father's friend. Father and Mother planned that, after birth, S.S.2 would live with

3

Father. Due to the known history of the family, and because Father was living in a residence outside of Monroe County unknown to the agency for which Father could not give the address, CYS told Father that it would need to inspect the home before S.S.2 could live there. Father refused, indicating that he was not sure whether his friend would permit CYS into the home. As a result, emergency protective custody was taken of S.S.2 and she was placed in foster care upon her release from the hospital. (*Id.* at 11-13 and 51). S.S.2 has remained in care ever since. (Id. at 11-13 and 51).

Paternal Grandmother's home was not at the time an option because it was being renovated. Unfortunately, the renovation lasted a long time, well into the dependency cases for the Children.

At the ensuing shelter care hearing, protective custody was continued. Father visited S.S.2 with the other Children and spoke to the CYS caseworker. During the conversation, Father indicated that he and Mother had reconciled and that they planned to live together after Mother was released. The CYS caseworker indicated that, due to the overall history, the agency would remain involved. (*Id.* at 10-13).

S.S.2's dependency hearing was convened on September 11, 2013. At that time, Mother was still in jail and Father reported that he had lost his job and had to move again. Father's plan was to live with another friend. S.S.2 was adjudicated dependent and aggravated circumstances were found as to Mother because her parental rights to A.P. and L.L. had previously been terminated. S.S.2 has been dependent ever since. (*Id.* at 15 and 51).

On September 17, 2013, Father came for a visit with S.S.2. At that time, he told the caseworker that he was homeless, had been living between friends' houses, and

4

had at times been living out of his car. He asked for help and for the Children to be placed in foster care until he could "get his act together." CYS personnel encouraged Father to try to work things out. Father agreed. Paternal Grandmother put the family up in a hotel for a night. Thereafter, with CYS's assistance, Father and moved into a family shelter with C.S., M.S., and S.S.1. (*Id.* at 19-21).

In early October of 2013, Father was stopped by police in New Jersey while driving with heroin and the Children in the car. He was arrested and charged with possession of heroin and endangering the welfare of the Children. Paternal Grandmother picked up the children and stayed with them for a night in a hotel. Unfortunately, she could not be a resource for them because her house was still being renovated and was not safe. (*Id.*).

As a result, on October 9, 2013, C.S., M.S., and S.S.1 were taken into protective custody. They have remained in care ever since. Later in October, all three Children were adjudicated dependent. (*Id.* at 21-23). Paternal Grandmother remained involved and had unsupervised community visits with all of the Children.

In January of 2014, Mother was released from jail. Four months later, in April of 2014, Father was released from prison. Review hearings were held in May of 2014. At that time, neither parent had satisfied their service plan goals. While both visited the Children, neither had housing or a documentable source of income and Mother was somewhat irregular with respect to drug screening. In addition, neither parent had attended M.S.'s evaluations or counseling sessions. (*Id.* at 26-29 and 34).

Subsequently, Father pled guilty to child endangerment. He was placed on

5

probation for 18 months. Conditions of his probation included compliance with the plans developed for him by CYS and drug screening.

In the summer of 2014, Father was afforded community visits supervised by Paternal Grandmother. After an initial problem or two, Mother was approved to participate in the visits as well. During this summer period, Mother began to slip on providing drug screens. Significantly, although denying use, Mother tested positive for Morphine on two screens that she did provide. In September of 2014, both parents asked for a meeting to discuss the Children and their goals. Neither parent showed up. (*Id.* at 36-42 and 59).

Permanency review and goal change hearings were held on October 31, 2013. As of the hearing, neither parent had housing or documentable income, Mother had not been compliant with drug screening, and, as indicated, Mother had tested positive for morphine. Dependency was continued and the goal of each child's case was changed to termination of parental rights and adoption. (Orders dated October 31, 2014).

Until the fall of 2013, the basic plan had been for the Children and Father to move into Paternal Grandmother's home when the renovations were completed. However, around Thanksgiving, Father informed CYS that he was no longer interested in that plan. (*Id.* at 65).

Between the goal change hearing and February of 2015, Mother's cooperation and participation began to wane. While Mother visited during this period, she did not provide drug screens at the frequency requested by CYS. Curiously, when she did provide screens, Mother insisted on wearing latex gloves and samples given on those

6

occasions did not register any temperature. The last screen given to CYS was on January 29, 2015. In addition, Mother (and Father) missed several appointments with CYS, including appointments scheduled at their request or for which caseworkers agreed to meet them before regular hours. Further, Mother still did not have housing. During this period she was living either with friends or with Father in a motel. Similarly, Mother still did not have documentable income. She informed CYS that she was a dancer at a Gentlemen's Club, but provided only her own self-generated compilation of her purported gross income and expenses. She did not provide a copy of the agreement she supposedly signed with the club or deposit slips showing money in the bank. Finally, Mother stopped visiting the Children. The last time she (or Father) visited any of the Children was on February 1, 2015, a visit at which the family celebrated C.M.'s birthday. Mother and Father left several subsequent messages that they were unable to attend visits or meetings due to car problems, but at the termination hearing Mother acknowledged that the vehicle problems were resolved by mid-March. Along similar lines, Mother testified that she grossed between $1,500 and $2,000 per week at the Gentlemen's Club, a salary that should objectively have been sufficient to provide for transportation to visits and sustain suitable housing. (*Id.* at 41-48, 53, 57-58, 61, 64-65, 69-73, and 79-82).

In early February 2015, CYS received a referral that Mother was using pills. (*Id.* at 49). Since Mother did not attend visits or appointments, the agency was unable to discuss the referral with her.

By February of 2015, the renovations at Paternal Grandmother's house had been completed and the home was safe for the Children. In February and early March

7

2015, the Children were transitioned into Paternal Grandmother's home. Although the transition has been somewhat hard on the Children, especially C.S. and M.S., Paternal Grandmother is handling it well and the Children are adjusting. The unrebutted evidence is that Paternal Grandmother loves the Children and they love her. Paternal Grandmother wants to be a permanent resource for the Children, and the Children are bonded with her. (*Id.* 47-51 and 55).

The Children are doing well and their needs are being met by Paternal Grandmother. All are adjusting to living with Paternal Grandmother full-time. C.S., M.S., and S.S.1 are all in elementary school. C.S. is going into fourth grade. She is receiving counseling to help her with the transition into living full-time with Paternal Grandmother. M.S. is properly placed in a partial hospitalization program through school, where he is being appropriately evaluated, treated, and followed, and where behavioral and adjustment issues are being addressed. M.S. and C.S. are receiving speech therapy. S.S.1 is going into first grade and is doing well. S.S.2 is not yet of school age. None of the children have any physical medicine issues. (*Id.* at 51-53 and 62-63).

On March 4, 2015, CYS filed petitions seeking termination of both parents' parental rights to all four children. The petitions were served on Mother on March 29, 2015.

A hearing on the petitions was held on May 4, 2015. Several CYS caseworkers and Mother testified, CYS introduced nineteen exhibits, and Mother introduced one exhibit. At the conclusion of the hearing, counsel for Mother opposed termination. She argued that Mother "has made steps toward meeting the requirements that Children

and youth have put on her," and asked the Court to leave the record open so that Mother could provide additional income information and a lease that Mother indicated she would be signing the day after the hearing. Mother's request was granted and the record was left open. The solicitor for CYS then expressed her opinion that the agency had proven statutory grounds for termination of both parents' parental rights. The Children's Guardian *ad litem* agreed that CYS had proven its case for termination as to all four of the Children, and expressed her belief that termination was in the best interests of the Children. Thereafter, the parties and their attorneys were informed that, based on the evidence presented, the undersigned believed that CYS had met its burden of proving statutory grounds for termination, but that the needs and welfare and bond affects analyses would be considered and taken under advisement. Finally, the parties were invited to submit memoranda on the issues. (Id. at 84-88).

Subsequently, Mother supplemented the record with a copy of a lease and some additional income information. The income information consisted only of Mother's hand-written accounting of her gross earnings and expenses – the same type of general, self-generated information she previously provided to CYS. (Mother's Additional Exhibits, filed May 8, 2015). No briefs were submitted.

The law we applied to the facts of these cases in reaching the decisions being challenged in these appeals is well settled. In comprehensive summary:

In termination cases, the burden is upon the petitioner, in this case CYS, to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008); *In re S.H.*, 879 A.2d 802, 806 (Pa. Super. 2005). Clear and convincing evidence has

9

been defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re K.Z.S.*, 946 A.2d 753, 757 (Pa. Super. 2008) (citation omitted). It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination. *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

Termination of parental rights is controlled by Section 2511 of the Adoption Act, 23 Pa. C.S.A. Section 2511. In this case, CYS sought termination of Mother's parental rights on the following grounds:

**Section 2511. Grounds for Involuntary Termination**

(a)     General Rule. – The rights of a parent in regard to a child may be terminated after a petition filed any of the following grounds:

(1)     The parents have, for a period of more than six (6) months prior to the filing of this petition, failed to perform their parental duties;

(2)     The repeated and continued incapacity, abuse, neglect or refusal of the parents has caused the child to be without essential parental care, control or subsistence necessary for his physical and mental well-being and the conditions and causes of the inability, abuse, neglect or refusal have not been remedied by the parents;

\* \* \*

(5)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or

10

placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8)    The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of

parental rights would best serve the needs and welfare of the child.

\* \* \*

(b)    Other considerations – The court in terminating the rights of a parent shall give primary consideration of the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. C.S.A. Section 2511(a)(1), (2), (5), (8), and (b). Satisfaction of any subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for involuntary termination of parental rights. *In re K.Z.S., supra; In re R.J.S.,* 901 A.2d 502 (Pa. Super. 2006). Accordingly, an appellate court "need only agree with the orphan's court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm." *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *app. den.,* 863 A.2d 1141 (Pa. 2004). *See also In re Adoption of C.J.P.,* 114 A.3d 1046 (Pa. Super. 2015); *In re K.H.B.,* 107 A.3d 175 (Pa. Super. 2014).

Section 2511 requires a bifurcated analysis.

11

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). *See also In re Adoption of C.J.P., supra; In re T.D., supra; In re Adoption of R.J.S.,* supra.

In analyzing the conduct of a parent, the applicable statutory language must be considered. As the third sentence of Section 2511(b) directs, when subsections (a)(1), (6), or (8) of Section 2511(a) are cited as the grounds for termination, we may not consider actions of a parent to remedy the conditions that necessitated the dependent child's placement which are initiated after the parent receives notice of the filing of the termination petition. *In re Adoption of C.J.P., supra; In re K.Z.S., supra; In re D.W.,* 856 A.2d 1231 (Pa. Super. 2004).

Under Section 2511(a)(1), parental rights may be terminated if, for a period of at least six months, a parent *either* demonstrates a settled purpose of relinquishing parental claims to a child or fails to perform parental duties. *In re Adoption of R.J.S., supra; In re Adoption of J.M.M.,* 782 A.2d 1024 (Pa. Super. 2001). As the Superior Court has explained:

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to

12

perform parental duties for at least the six months prior to the filing of the termination petition. Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.

*In re K.Z.S., supra* at 758 (Pa. Super. 2008) (case citations and quotation marks omitted). *See also In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct. Rather, those grounds may include acts of refusal as well as incapacity to perform parental duties.

> Parental rights may be terminated pursuant to Section 2511(a)(2) if three conditions are met: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental wellbeing. 23 Pa.C.S.A. § 2511(a)(2). Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and **strong, continuous parental ties**, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.... Further, grounds for termination under subsection (a)(2) are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental duties.

13

*In re E.A.P.,* 944 A.2d 79, 82 (Pa. Super. 2008) (case citations and internal quotation marks omitted) (emphasis in original). *See In re Adoption of R.J.S., supra.* Thus,

> While sincere efforts to perform parental duties can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

*In re Z.P.,* 994 A.2d at 1117-18 (case citations and internal quotation marks omitted). Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child. *In re Adoption of Michael J.C.,* 486 A.2d 371, 375 (Pa. 1984); *In re Z.P, supra.*

In order for termination pursuant to 23 Pa.C.S.A. § 2511(a)(5) to be proper, "the following factors must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child." *In re K.H.B.,* 107 A.3d 175 (Pa. Super. 2014) (quoting *In re Adoption of M.E.P.,* 825 A.2d 1266, 1273–74 (Pa.Super.2003)). *See also In re Adoption of K.J.,* 936 A.2d 1128, 1133 (Pa. Super. 2007), *app. den.,* 951 A.2d 1165 (Pa. 2008).

To terminate parental rights under Section 2511 (a)(8), the party seeking termination of parental rights need only show "(1) that the child has been removed

14

from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or the placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of R.J.S., supra* at 511. *See In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). The one year time period is significant. As the Superior Court has explained:

> Section 2511(a)(8) sets a twelve–month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic period. The relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing. This Court has acknowledged:
>
> > [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re I.E.P.*, 87 A.2d 340, 345-46 (Pa. Super. 2014) (case citations and internal quotation marks omitted).

With respect to the "needs and welfare" analysis pertinent to subsections 2511(a) (5), (8), and (b), the Superior Court has observed:

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in

15

Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the 'needs and welfare of the child' prior to proceeding to Section 2511(b), which focuses on the 'developmental, physical and emotional needs and welfare of the child.' Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the 'needs and welfare' of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008–1009 (Pa. Super. 2008) (*en banc*) (citations omitted). *See also In re I.E.P., supra; In re Adoption of K.J., supra* at 1133.

Subsection 2511(a)(8), "does not require an evaluation of the remedial efforts of either the parent or DHS." *In re B.C.*, 36 A.3d 601, 611 (Pa. Super. 2012) (citing *C.L.G.*, 956 A.2d at 1007).

Simply put, Section 2511, including the subsections cited and explained above, outlines certain irreducible requirements that parents must provide for their children. Parents who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have their parental rights terminated. *In re K.Z.S., supra; In re B.L.L.*, 787 A.2d 1007 (Pa. Super. 2001).

There is no simple or easy definition of parental duties. However, the appellate cases make it very clear that parenting is an active rather than a passive obligation

16

that, even in the face of difficulty, adversity, and incarceration, requires a parent to take and maintain a place of importance in the child's life. The following passage is instructive:

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> * * *
>
> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

In re K.Z.S., supra at 759. See also In re Burns, 379 A.2d 535 (Pa. 1997); Adoption of Baby Boy A. v. Catholic Social Services of the Diocese of Harrisburg, 517 A.2d 1244 (Pa. 1986); In re Shives, 525 A.2d 801 (Pa. Super. 1987).

In relation to the parental requirements outlined in Section 2511, when a parent is separated from his or her child, it is incumbent upon the parent "to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life." In re G.P.-R., 851 A.2d 967, 977 (Pa. Super. 2004). When a parent has abandoned or effectively abandoned a child,

> [t]o be legally significant, the post abandonment contact must be steady and consistent over a period of time,

17

contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-   child relationship and must also demonstrate a willingness and capacity to understand the parental role. ***The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.***

*In re T.D.*, 949 A.2d at 919 (case citations and brackets omitted) (emphasis in original). Finally, parents are required to make diligent efforts towards assumption or resumption of full parental responsibilities. Accordingly, a parent's vow to cooperate, after a long period of being uncooperative regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *In re Adoption of K.J., supra; In re A.L.D.*, 797 A.2d 326 (Pa. Super. 2002).

Once statutory grounds for termination have been established, the court must, in accordance with Section 2511 (b), consider whether the child's needs and welfare will be met by termination. A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. Intangibles such as love, comfort, security, and stability are involved in the inquiry. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond, if any, between parent and child. If a bond is determined to exist, the effect on the child of permanently severing the bond must be analyzed and considered. *See In re K.M.*, 53 A.3d 781 (Pa. Super. 2012); *In re T.D., supra; In re L.M., supra; In re Adoption of R.J.S., supra*. As to the bond analysis, the Superior Court has stated:

> in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no

18

> bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa.Super.2008).

*In re K.H.B.*, 107 A.3d 175, 180 (Pa. Super. 2014).

In addition to a bond examination, a court may equally

> emphasize the **safety** needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent-child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*In re K.Z.S.*, 946 A.2d at 763 (emphasis in original).

When, as here, the petitioner is an agency, "it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S.A. § 2512(b). However, the existence or absence of a pre-adoptive home is an important factor. So is the relationship between the child and the foster or pre-adoptive parents. As our Supreme Court cogently stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. *In re: T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). *See In re K.M., supra.*

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated:

> [I]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the

19

developmental, physical and emotional needs and welfare of the child.' 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include '[i]ntangibles such as love, comfort, security, and stability. In *In re E.M.,* [620 A.2d 481, 485 (Pa. 1993) ], this Court held that the determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention'" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.* 71 A.3d at 267. The Court additionally observed:

contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved....Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes.

20

*In re T.S.M.*, 71 A.3d at 269.

In this case, Mother was incarcerated for a portion of the time that the children were in care. Incarceration, standing alone, neither constitutes sufficient grounds for termination of parental rights nor removes the obligation to perform required "bond effects" and "needs and welfare" analyses. However, it is a factor that must be considered and, in a proper case, such as when a parent is serving a prohibitively long sentence, may be determinative. *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012); *Z.P.*, 994 A.2d at 1120. "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind...that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what she is supposed to be doing in prison." *In re E.A.P.*, 944 A.2d at 84.

The analysis depends in part on the asserted grounds for termination. In subsection (a)(1) abandonment cases, our Supreme Court has stated:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re Adoption of S.P.*, 47 A.3d at 828 (quoting *In re Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975) (footnotes and internal quotation marks omitted). Thus, in an abandonment case, a parent is required to *both* utilize available resources *and* take affirmative steps to support a parent-child relationship. If the parent fails to do so, his

21

parental rights may be terminated. *See In re Adoption of W.J.R.,* 952 A.2d 680 (Pa. Super. 2008); *In re E.A.P., supra; In re K.J., supra.* However, utilization of available resources does not guarantee preservation of parental rights. The statutory criteria, the facts and circumstances of each case, and the best interests, needs, and welfare of the child must all still be considered.

In cases involving parental incapacity, our Supreme Court recently held that:

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P,* 47 A.3d. at 828. In more expanded terms, the Supreme Court stated:

> In line with the expressed opinion of a majority of justices in [*In re R.I.S.,* 614 Pa. 275, 36 A.3d 567 (2011) ], our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*Id.* at 830. In sum, a parent's incarceration "is relevant to the subsection (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the "essential parental care, control or subsistence" that the section contemplates." In re A.D., 93 A.3d at 897.

22

Finally, before filing a petition for termination of parental rights, the Commonwealth is generally required to make reasonable efforts to promote reunification of parent and child. *In re Adoption of R.J.S. See also In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). However, the Commonwealth does not have an obligation to make reunification efforts indefinitely.

> The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. When reasonable efforts to reunite a foster child with his or her biological parents have failed, then the child welfare agency must work toward terminating parental rights and placing the child with adoptive parents. The process of reunification or adoption should be completed within eighteen (18) months. While this time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re Adoption of R.J.S., supra* at 507 (internal case citations, quotation marks, and footnote omitted).

Applying the law summarized above to the facts of these cases, we found that statutory grounds for termination of Mother's parental rights had been established by clear and convincing evidence, and further, that termination of her rights best served the needs and welfare of the Children. Prompted by Mother's appeal, we have again carefully reviewed the record and remain convinced that our decisions are supported by both the facts and the law, and, moreover, fulfilled and advanced the best interests of the Children.

23

As of the termination hearing, CYS had been involved with this family for more than four and one-half years. C.S., M.S., and S.S.1 had been dependent and in care for nineteen months, and S.S.2 had been under the supervision of CYS and in care for twenty months since her birth in September of 2013. In addition, aggravated circumstances had been found in S.S.2's case based on the termination of Mother's parental rights to A.P. and L.L.

Both before and after the Children were adjudicated dependent and placed in foster care, Mother consistently demonstrated a lack of capacity to perform parental duties for not only the four Children involved in these cases, but also, for A.P., L.L., and three other children to whom she has given birth.[3] In fact, she did not at any time provide care for S.S.2. Similarly, despite the provision of services by CYS and some support from Father and Paternal Grandmother, Mother demonstrated an inability to remedy the conditions which caused the Children to be placed or to satisfy service plan goals. In this regard, Mother has consistently been unable to obtain and maintain either suitable housing or employment. She has also continued to use drugs, was irregular with drug testing and appears to have manipulated the most recent screens she provided, was in jail for a portion of the case for non-support of the Children, and has been unable to show that he has the emotional capability to care for the Children. Additionally, from the history of this family, the evidence presented at numerous hearings, and our in-person observations of Mother, it is and was clear to us that she would have no chance of being able to parent or remedy the conditions that caused the Children's placements without the assistance of Father, who has given up and has

---

[3] Mother has given birth to a total of nine children. She has not had custody of any of them for years. (N.T., 5/4/2015, p. 66). As discussed, her parental rights to A.P. and L.L. were previously terminated by orders of this Court.

24

not appealed the termination decrees. Further, foster parents or Paternal Grandmother, rather than Mother, have provided nurturing and care for the Children and have insured that their physical, mental, emotional, medical, developmental, and daily needs have been met. Finally, although Mother until early this year was regular in visiting the children, she has not visited or seen them since February 1, 2015. Under these circumstances and the evidence presented at hearing, it was clear to us that CYS had established grounds for termination of Mother's parental rights to the Children under subsections 2511(a)(1), (2), (5), and (8).[4]

With respect to the bond effects and needs and welfare analyses required by Sections 2511 (a)(5) and (8) and (b) and applicable case law, it was just as clear to us that the best interests and welfare of the Children required that Mother's parental rights be terminated. Up until early this year, Mother attended visits on a fairly regular basis and, at hearing, expressed love for the Children. However, a parent's own feelings of love and affection for a child, standing alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010); *In re L.M.*, 923 A.2d 505 (Pa. Super. 2007). Moreover, Mother's visits and expressions of love have not been enough to prompt her to find and maintain housing, stay out of prison, take advantage of the services provided by CYS, stop using drugs, or put herself in the position of being capable of caring for or parenting the Children. She has simply not demonstrated the parental stability that the Children need. Similarly, despite the provision of substantial services, Mother has shown that she is not capable of

---

[4] On review prompted by Mother's appeal, we have re-considered one aspect of our ruling. We now believe that Mother's parental rights should not have been terminated as to S.S.2. under Section (a)(5) because S.S.2. came into protective custody directly from the hospital after her birth, and therefore, was not removed from Mother's care. However, we continue to believe that our decisions were correct in all other respects.

25

remedying the conditions that caused the Children to come into care. This is not new. As indicated, the same problems have plagued Mother for years with respect to all of her children.

More importantly, Mother has unfortunately been unable to satisfactorily progress to the point that she could properly parent the Children. Up until the beginning of this year, Mother visited the Children. Her unilateral cessation of visits at that time is at once inexplicable and inconsistent for a parent asking the Court to preserve her parental rights. In any event, scheduled visits while others care for the Children, without more, do not satisfy the spectrum of parental duties that Mother owes the Children. Scheduled visits do not provide the love, protection, guidance and support that the Children need, and Mother is obligated to bestow, and do not achieve the permanency that the law demands and the Children deserve.

The Children need and deserve permanency, stability, love, support, and parental care. Their needs have not been met by Mother. Instead, they have been met by others, especially Paternal Grandmother. Moreover, nothing in the record suggests that Mother will be able to meet the Children's needs in the future. Mother appeared at (or shortly after) the termination hearing with a lease, an assertion that she was employed at a Gentlemen's Club, and a promise that things would get better. However, her eleventh-hour, post-petition efforts are as a matter of law insufficient to stave off termination under Sections 2511(a) (1) and (8), and on balance and consideration of all facts, circumstances and standards, insufficient to counter the overwhelming evidence supporting termination of her parental rights on the other grounds asserted by CYS. Moreover, given the facts presented at hearing, and

26

considering Mother's history, we found that the Children's lives simply could not and should not be put on hold in the hopes that, at some point in the future, Mother will summon the ability to handle the responsibilities of parenting while maintaining stable and suitable housing, a job, and sobriety.

At hearing, there was some evidence of a bond between Mother and the children. However, the bond is attenuated and weakened by the fact that S.S.2 never resided with Mother (or Father) and Mother never parented her, the other three Children have not lived with Mother for several years, Mother has had only supervised visits with the Children, Mother stopped visiting after February 1, 2015, and others, especially Paternal Grandmother, have provided parenting for the Children while Mother did not.

On the other hand, the Children are doing well living together with Paternal Grandmother who, through it all, has been a positive constant in their lives and who is a permanent resource for them. Paternal Grandmother is bonded with the Children and they are bonded with her. Simply, Paternal Grandmother has provided the children with the love, support, nurturing, and care that Mother has been unable to provide.

Under these facts, we found that whatever bond exists between Mother and the Children is neither as strong nor as enduring and nurturing as the bond that exists between the Children and Paternal Grandmother. Consistently, we found that severing parental ties with Mother would not harm the Children mentally, emotionally, or spiritually, while breaking the bond with Paternal Grandmother, who has been and is being their parent, would do them significant harm.

Simply, under the facts and circumstances of this case, we found that termination of Mother's parental rights and permanency with Paternal Grandmother would at once best serve the developmental, physical, and emotional needs and welfare of the Children and promote their best interests.

We stand by our decisions.

Date: 7/22/15

_____
Jonathan Mark, J.

Cc:   Superior Court of Pennsylvania
       Jonathan Mark, Judge
       Kathleen Walters, Esq.
       Hillary Madden, Esq.
       Elizabeth B. Weekes, Esq.

2015 JUL 22 PM 2 00
MONROE COUNTY, PA
CLERK OF COURTS

28